BURLINGTON COUNTY EVERGREEN PARK MENTAL HOSPITAL, APPELLANT, v. DOROTHY COOPER AND THE PUBLIC EMPLOYMENT RELATIONS COMMISSION, AN AGENCY OF THE STATE OF NEW JERSEY, RESPONDENTS.

Argued June 2, 1970—Decided July 24, 1970.

Mr. *Frank X. McDermott* argued the cause for appellant (*Messrs. Richard F. Powell, Jr.,* and *Sanford Soren,* on the brief; *Messrs. Apruzzese* and *McDermott,* attorneys).

Mr. *Stephen F. Lichtenstein* argued the cause for respondent Cooper (*Mr. Paul G. Levy,* on the brief; *Messrs. Coleman, Lichtenstein, Levy and Segal,* attorneys).

*Mr. Theodore A. Winard,* Deputy Attorney General, argued the cause for respondent Public Employment Relations Commission (*Mrs. Priscilla Read Chenoweth,* Deputy Attorney General, on the brief; *Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

*Mr. Philip S. Carchman* argued the cause for *amicus curiae,* New Jersey Civil Service Commission.

The opinion of the court was delivered by

FRANCIS, J. This case requires a review of the power granted to the New Jersey Public Employment Relations Commission under Chapter 303, *L.* 1968, *N. J. S. A.* 34:13A–1 *et seq.,* with respect to the discharge from the public service of a "temporary" employee because she joined and assisted in the organizational work of a public employees' union.

A short summary of the facts as asserted by the employee, Mrs. Dorothy Cooper, is necessary for purposes of perspective. Mrs. Cooper had been employed by the Burlington County Evergreen Park Mental Hospital from 1962 to 1966 at which time she moved out of the State. She was in good standing when she left her employment here. Subsequently, she returned to New Jersey, and on October 28, 1968 was reemployed as a hospital attendant. The nature of her reemployment arrangement is not entirely clear. The record indicates that she was given a non-competitive appointment (probably because of her previous experience and good record) to continue for four months. It was her understanding that, if her work was satisfactory, at the end of this probationary or "working test period" she would receive permanent Civil Service status. *Cf.* Revised Civil Service Rules, *N. J. A. C.* 4:2–40, 4:2–49, 4:2–61 and 4:13–7b. Mrs. Cooper's statements about the terms of her reeemployment were not disputed.

Around the end of January 1969, organizational efforts began among the hospital employees on behalf of the Ameri-

can Federation of State, County and Municipal Employees (Union). Mrs. Cooper participated in these activities and at a meeting on February 27, 1969 she was elected president of the local Union. On the previous day, John Franks, the Hospital Superintendent, called a meeting of all the hospital employees at which time he advised them not to join the Union. He warned them also that they might lose their jobs if they did join.

On February 27, 1969, Mrs. Cooper completed her four months period of temporary employment. Apparently her work had been satisfactory because on the morning of the 27th the routine procedure to give her permanent employee status was commenced; she was allowed to sign Civil Service Commission CS-6 Personnel Action Form. In the afternoon of that day she was elected president of the Union. On March 3, 1969 the CS-6 form, properly signed by Mrs. Cooper, the Hospital and the County, was received by the Civil Service Commission.

In the meantime, other events had taken place. On February 28, Mrs. Cooper reported to the Hospital that she was ill. A superior told her to come in "ill or not." When she said she was too sick to do so, the superior informed her that she was discharged; later the same day the discharge was confirmed by Mr. Franks. She attempted to return to work on the next two days but was asked to leave. Returning to the day of March 3, after the CS-6 form had been received by the Civil Service Commission, the County called the Commission and asked that the form be returned without action toward making Mrs. Cooper a permanent employee. The request was complied with and on March 4 the Commission received notice of the termination of her services. According to affidavits submitted on behalf of Mrs. Cooper, a meeting was held, on March 4, between Mrs. Cooper, a Union organizer and Hospital Superintendent Franks. At the meeting, Franks is said to have admitted that Mrs. Cooper was fired because of her union activities.

On March 13, through counsel, Mrs. Cooper appealed to the Civil Service Commission from her discharge. She alleged that it was based upon her union organizational activity. On April 3, the Commission notified her counsel by letter that Mrs. Cooper's appointment had been for four months' temporary employment, effective October 28, 1968, and that her services had been terminated on February 28, 1969. The letter continued "[i]nasmuch as the permanent appointment of Mrs. Cooper was not processed and approved by the Department of Civil Service, there is no basis for an appeal. The Commission directed, therefore, that your request for a hearing be denied." This letter was sent pursuant to the Revised Civil Service Rule, *N. J. A. C.* 4:16–8b; which says:

"b. A provisional or temporary employee may be terminated at any time at the discretion of the appointing authority. A provisional or temporary employee who has been terminated shall have no right of appeal to the Civil Service Commission."

■ If, as is alleged and not denied in the record before us, Mrs. Cooper's work record was satisfactory, and the Hospital not only refused to grant her permanent status but instead discharged her solely because of her union activity, the. Civil Service Commission was in error in refusing to hear her appeal. The action of the Hospital in the circumstances constituted a violation of the right granted to her by *Art* I, *par.* 19 of the 1947 *Constitution,* and by the implementing statute, *N. J. S. A.* 34:13A–5.3, to form, join and assist a union of her fellow employees in an appropriate unit. By implication, this right became an integral part of her employment contract with the Hospital, irrespective of its temporary or probationary character. Denial of permanent status to an employee solely because she had engaged in her constitutional or statutory right to join or to persuade other employees to join a union clearly would be arbitrary and illegal conduct by an employer. *State ex rel Missey v. City of Cabool,* 441 *S. W.* 2d 35 (Mo. Sup. Ct. 1969); and *cf.*

*Zimmerman v. Board of Education of Newark,* 38 *N. J.* 65, 80 (1962) (concurring opinion), *cert. den.* 371 *U. S.* 956, 83 *S. Ct.* 508, 9 *L. Ed.* 2d 502 (1963) ; *Dodd v. Van Riper,* 135 *N. J. L.* 167 (E. & A. 1947) ; *Divine v. Plainfield,* 31 *N. J. Super.* 300 (App. Div. 1954) ; *Lingrell v. N. J. Civil Service Commission,* 131 *N. J. L.* 461 (Sup. Ct. 1944). Unquestionably, under the *Constitution, Art.* VII, § 1, *par.* 2 and the Civil Service Law the Commission had broad supervisory power over employment activities, including removal or discharge of employees in county and municipal public service. See *Borough of Park Ridge v. Salimone,* 21 *N. J.* 28, 44–45 (1956) ; *N. J. S. A.* 11:21–3, 4, 6 and 11:22–38; and *cf.* Revised Civil Service Rule, *N. J. A. C.* 4:13–7b (effective July 1, 1969) which says :

> "For any reason other than unsatisfactory performance, separation during the working test period must conform to the procedures relating to removal of permanent employees, including the right to a hearing."

That power must be considered as broadened even further by reason of *Art.* I, *par.* 19 of the 1947 *New Jersey Constitution,* and particularly by section 7 of the Employer-Employee Relations Act, *supra,* which was enacted to implement and to protect the public employee's right to organize and to join unions. *N. J. S. A.* 34:13A–5.3. That statute made it plain that whatever the nature of the further implementation, the Legislature intended that, "Nothing herein shall be construed to deny to any individual employee his rights under Civil Service laws or regulations." Under the circumstances, the Commission's refusal to grant a hearing on Mrs. Cooper's appeal from what would appear to be the employer's arbitrary and illegal withholding of permanent employee status, represented, in our opinion, a self-imposed limitation of power. That limitation undoubtedly arose from a lack of awareness of the enhancement of the public employees' organizational rights vis-a-vis their employer by virtue of *N. J. S. A.* 34: 13A–1 *et seq.,* as well as the Civil Service Commission's

broadened authority and obligations in the public employment sector resulting from that statute.

At any rate, after the Civil Service Commission declined to hold a hearing to review the propriety of her discharge, Mrs. Cooper did not pursue an appeal to the Appellate Division. Instead, she filed a petition with the Public Employment Relations Commission (PERC) under the New Jersey Employer-Employee Relations Act, seeking (1) a determination that the Hospital was guilty of discriminatory and unfair labor practices in discharging her, and (2) a recommendation that she be reinstated in her employment with back pay. The Hospital objected to the jurisdiction of PERC, declined to file an answer to the petition, and notified PERC of its intention not to appear at the hearing scheduled in the matter but, rather, to continue its jurisdictional contest.

A hearing, at which the Hospital did not appear, was held before a Hearing Officer designated by PERC. Uncontradicted testimony was introduced showing that Mrs. Cooper was discharged because of her organizational union activities. The Hearing Officer found that the Hospital, in denying Mrs. Cooper permanent employment status and in discharging her, unlawfully interfered with the exercise of rights guaranteed to her by the Employer-Employee Relations Act. Consequently, he recommended: (1) that she should be reinstated to her position as hospital attendant; (2) that the Hospital should resubmit her CS-6 form to the Civil Service Commission with the recommendation that she be granted permanent employment; (3) that she should be paid all wages lost as a consequence of the Hospital's unfair discrimination; and (4) that the Hospital should be required to post the decision of PERC that it was guilty of the offense charged and had been ordered to comply with all provisions of the Act.

The Hospital filed exceptions to the report reiterating its claim of PERC's lack of jurisdiction and also asserting that PERC was without authority to hear a matter which had already been disposed of by the Civil Service Commission.

The exceptions were overruled and the Hearer's decision was affirmed. PERC ordered the Hospital to cease and desist from (a) discriminating against any employee in regard to hire, tenure and conditions of employment in order to discourage membership in the union, (b) unlawfully threatening employees concerning their employee organization membership or activities, or (c) directly or indirectly interfering with, restraining or coercing its employees in the exercise of rights guaranteed them by section 7 of the Act. In addition, the order directed the Hospital to take certain affirmative action which PERC found would effectuate the policies of the Act, *i. e.*, (a) offer Mrs. Cooper immediate reinstatement to her former or a substantially equivalent position, resubmit the CS–6 form as the Hearer recommended, and make her whole for any loss of earnings, (b) post a certain notice at the Hospital as recommended by the Hearer, and maintain it there for 60 consecutive days, and (c) notify the Executive Director of PERC within 10 days that the mandated steps have been taken. The Hospital appealed to the Appellate Division from the order, and we certified the matter before it was argued there.

The New Jersey Employer-Employee Relations Act, *N. J. S. A.* 34:13A–1 *et seq., L.* 1968, *c.* 303, was adopted in 1968 as an amendment and supplement to the New Jersey Labor Mediation Act. It followed a long study by a Legislative Commission of the need for establishing a procedure for considering the grievances of public employees. *L.* 1966, *c.* 170. The history of the Act as well as a consideration of the final report and recommendations of the Commission appears in our recent opinion in *Lullo v. International Ass'n of Fire Fighters,* 55 *N. J.* 409 (1970) and need not be repeated here. From a substantive standpoint, this case centers largely about *N. J. S. A.* 34:13A–5.3. It provides that "public employees shall have, and shall be protected in the exercise of; the right, freely and without fear of penalty or reprisal, to form, join and assist any employee organization or to refrain from any such activity * * *." Further, it says

that "Representatives designated or selected by public employees for the purposes of collective negotiation by the majority of the employees in a unit appropriate for such purposes or by the majority of the employees voting in an election conducted by the commission as authorized by this act shall be the exclusive representatives for collective negotiation concerning the terms and conditions of employment of the employees in such unit. * * * Nothing herein shall be construed to deny to any individual employee his right under Civil Service laws or regulations."

The duly selected majority representative is authorized to negotiate agreements covering all employees in the unit and is declared to be responsible for representing the interests of all such employees without discrimination. The majority representative and designated representatives of the public employer are directed to meet at reasonable times and to negotiate in good faith with respect to grievances and terms and conditions of employment. When such an agreement is reached it is required to be signed by the parties. Public employers are directed to negotiate written policies setting forth grievance procedures "by means of which their employees or representatives of employees may appeal the interpretation, application or violation of policies, agreements, and administrative decisions affecting them." The grievance procedures may provide for binding arbitration as a means for resolving disputes.

To administer Chapter 303 the Legislature established the Public Employment Relations Commission. In addition to whatever powers and duties given to it by Chapter 303, it was vested with the same powers and duties as the New Jersey State Board of Mediation with respect to mediation and arbitration of disputes in private employment. It was authorized to "make policy and establish rules and regulations concerning employer-employee relations in public employment relating to dispute settlement, grievance procedures and administration including enforcement of statutory provisions concerning representative elections and related mat-

ters." The Commission was to consist of seven members to be appointed by the Governor: two of them must be representative of public employers; two must represent public employee organizations; and three (including the appointee who is designated as chairman) must represent the public. *N. J. S. A.* 34:13A-5.2.

With respect to powers and duties of the Commission, the statute provides:

"(b) Whenever negotiations between a public employer and an exclusive representative concerning the terms and conditions of employment shall reach an impasse, the commission, through the Division of Public Employment Relations shall, upon the request of either party, take such steps as it may deem expedient to effect a *voluntary* resolution of the impasse. In the event of a failure to resolve the impasse by mediation * * * [the Commission] is empowered to recommend or invoke fact-finding with recommendation for settlement, the cost of which shall be borne by the parties equally." *N. J. S. A.* 34:13A-6(b). (Emphasis and insertion ours).

In the present case, no majority representative had been selected for the hospital employees at the time this controversy arose.

"(c) * * * [T]he commission in public employment, * * * shall take the following steps to avoid or terminate labor disputes: (1) to arrange for, hold, adjourn or reconvene a conference or conferences between the disputants or one or more of their representatives or any of them; (2) to invite the disputants or their representatives or any of them to attend such conference and submit, either orally or in writing, the grievances of and differences between the disputants; (3) to discuss such grievances and differences with the disputants and their representatives; and (4) to assist in negotiating and drafting agreements for the adjustment in settlement of such grievances and differences and for the termination or avoidance, as the case may be, of the existing or threatened labor dispute." *N. J. S. A.* 34:13A-6(c).

"(d) The commission * * * is hereby empowered to resolve questions concerning representation of public employees by conducting a secret ballot election or utilizing any other appropriate and suitable method designed to ascertain the free choice of the employees. The * * * [Commission] shall decide in each instance which unit of employees is appropriate for collective negotiation * * *. All of the powers and duties conferred or imposed upon the * * * [Commission] that are necessary for the administration of this

subdivision, and not inconsistent with it, are to that extent hereby made applicable. * * *" *N. J. S. A.* 34:13A–6(d). (Insertion ours.)

Additionally, *N. J. S. A.* 34:13A–11 says:

"The board [New Jersey State Board of Mediation] shall have power to adopt, alter, amend or repeal such rules in connection with the voluntary mediation of labor disputes in private employment and the commission shall have the same powers in public employment, as may be necessary for the proper administration and enforcement of the provisions of this act." *N. J. S. A.* 34:13A–11. (Insertion ours.)

On the basis of the portions of Chapter 303, *L.* 1968, referred to above, the Commission asserts that it had the authority, (1) to entertain petitions or complaints from individual public employees, such as Mrs. Cooper, charging the public employer with unfair labor practices, (2) to decide whether the conduct of the employer constituted unfair labor practice, (3) in the event of a decision against the employer, to order the employer to cease and desist from the conduct found to be an unfair labor practice, and (4) in such case, to require the employer to take such corrective action as the Commission deems appropriate to effectuate the policies of the Act. More particularly as to Mrs. Cooper, the Commission says it is empowered to hear her charge of an unfair labor practice and to decide that the Hospital was guilty of such a practice in that the Hospital unlawfully interfered with the exercise of her right "freely and without fear of penalty or reprisal, to form, join or assist" the Union which was soliciting employee membership. It says also that it has the power to order the Hospital to reinstate her to employment as an attendant and to make her whole for any loss of earnings.

Since the filing of Mrs. Cooper's petition or complaint with PERC, and subsequent to the hearing thereon and the Hearer's decision, but before the affirmance thereof, the Commission promulgated an elaborate set of rules and

regulations, effective August 29, 1969, concerning matters of procedure in representation proceedings, impasses in employer-employee labor disputes and negotiations, hearings and remedial orders. *N. J. A. C.* 19:10–1 *et seq.* Among other things, the Commission specifically listed in *N. J. A. C.* 19:13–2 (a) and (b) various types of unfair labor practices, on the part of both public employers and employee organizations, which it "may consider violative of the Act." This was done, the Rule says, "[t]o effectuate the purposes of the Act and the enforcement of its statutory provisions, and to provide more detailed criteria for the protection of the rights secured under the Act." The outline of the practices appears to be patterned after the itemization of unfair labor practices specified by Congress in section 158 of the Federal Labor-Management Relations Act which is applicable in the private employment sector. 29 *U. S. C. A.* § 158. Also, the outline purports to incorporate by rules the similar specifications actually authorized and contained in a number of public employer-employee relations acts in other states. The Commission's rules say that when violations of its rules are found the Commission "shall order the respondent to cease and desist from conduct violative of the Act and these Rules and Regulations and may require the respondent to take such affirmative corrective action as * * * [the Commission] deems appropriate to effectuate the policies of the Act and these Rules and Regulations." *N. J. A. C.* 19:14–18. The substance of this language likewise follows the authorization specifically conferred by Congress on the National Labor Relations Board by section 160(c) of the Federal Act. 29 *U. S. C. A.* § 160(c). Similar language appears as a specific grant of power in some of the public employer-employee relations acts in force in other states. The Rules and Regulations of the Commission are not under general attack before us. We have referred to them because they include the types of unfair labor practice over which the Commission maintains it has implied jurisdiction, under the Act, to find and order remedied.

The Hospital contends that a study of the statute in its entirety, including its history, demonstrates that the Legislature did not intend to confer jurisdiction on the Commission to decide what acts or conduct shall constitute unfair labor practices, to decide such issues in quasi-judicial adversary proceedings, or to issue against a public employer found guilty of such practices cease and desist orders or orders directing reinstatement of discharged employees with back pay. It argues further that a view of the total act shows an intent to parallel the mediation function of the New Jersey State Board of Mediation in the private employment sector with a substantially comparable commission in the public employment sector.

The Act contains a policy declaration which notes that the best interests "of the people of the State are served by the prevention or prompt settlement of labor disputes, both in the private and public sectors * * *; and that the *voluntary mediation of such public and private employer-employee disputes* under the guidance and supervision of a governmental agency will tend to promote permanent, public and private employer-employee peace and the health, welfare, comfort and safety of the people of the State. * * *." *N. J. S. A.* 34:13A-2. (Emphasis ours).

After creating the Commission to administer the Act, the Legislature, in defining the scope of power being bestowed to that end, used language clearly compatible with its declaration of policy. The language puts the emphasis on voluntary settlement and mediation. As quoted above, *N. J. S. A.* 34:13A-6(b) deals with the situation where the employer and the exclusive representative of the employees reach an impasse in their negotiations concerning the terms and conditions of employment. In such case, at the request of either party the Commission is required to take such steps as it may deem expedient to effect "a voluntary resolution of the impasse." If that proves unsuccessful, then the Commission is "empowered" to recommend or invoke fact-finding with recommendation for settlement. Note the absence of any

provision for affirmative or remedial *orders* by the Commission.

*N. J. S. A.* 34:13A–6(c) sets out the procedure to be taken to avoid or to terminate labor disputes. Again, the tenor of the language bespeaks voluntary settlement and mediatory intercession. The Commission is directed (1) to arrange for and to hold conferences between the disputants, (2) to *invite* the disputants to attend such conferences and to submit their differences and grievances, (3) to discuss the grievances and differences with the disputants, and (4) to *assist* in negotiating and drafting agreements for their adjustments and for the termination or avoidance of the existing or threatened labor dispute. Note again the absence of a grant of authority to find either party guilty of a violation of the Act in connection with the dispute or to make an affirmative remedial order in connection with the dispute. There is little doubt that the controversy over the propriety of Mrs. Cooper's discharge by the Hospital for union activities would constitute a labor dispute within this section. *Cf. N. J. S. A.* 2A:15–58.

*N. J. S. A.* 34:13A–6(d) seems to contain the only affirmative grant of power to hear, decide and make enforcement orders on an aspect of the Act. This subsection empowers the Commission "to resolve" questions concerning representation of public employees by conducting secret ballot elections or by utilizing any other appropriate method to ascertain the employees' free choice. It is authorized to "decide" problems relating to the appropriate unit for collective negotiation. And in addition, "[a]ll of the powers * * * necessary for the administration of this subdivision" are made applicable. Finally, if formal hearings are required to decide the issue of appropriate unit, the Commission is authorized to issue subpoenas and to make the rules and regulations for the conduct of the hearing.

Subsection (d) makes it plain that when the Legislature wished to confer express adjudicatory power in this Act it did so unequivocally. Moreover, this subsection makes more

understandable the portion of subsection (b) of *N. J. S. A.* 34:13A–5.2 which authorizes the Commission to make policy and rules and regulations for "enforcement of statutory provisions concerning representative elections and related matters." These two subsections are thus compatible in aim and inescapably draw attention to the fact that here we have the only reference in the entire statute to "enforcement" by the Commission. Sensibly "related matters" in the contex signify matters having to do with representative elections. In the field of labor relations there are many such subjects: appropriate unit, consent elections, employer petitions, employee petitions, faulty or incomplete petitions, dual or inconsistent petitions, jurisdictional disputes, informal election procedures, showing of interest, prior election a bar, area or industry wide elections, authorization cards, ballots, period between elections, challenging voters, cut off date, qualification of voters, objections to election results, certification of bargaining representative, decertification proceedings, and many others.

Just as the "enforcement" portion of subsection (b) of *N. J. S. A.* 34:13A–5.2 meshes with subsection (d) of *N. J. S. A.* 34:13A–6 relating to the powers and duties of the Commission, so the first portion of subsection (b) which authorizes the Commission to make rules and regulations "concerning employer-employee relations in public employment relating to dispute settlement, grievance procedures and administration" (and makes no mention of "enforcement") meshes with subsections (b) and (c) of *N. J. S. A.* 34:13A–6, described above. As noted, the latter two subsections require efforts by the Commission to bring about voluntary settlement of impasse situations relating to terms and conditions of employment (subsection (b)) and in labor disputes (subsection (c)). And only in *N. J. S. A.* 34:13A–6(b) is there a suggestion of anything stronger than voluntary settlement or mediation; according to that subsection, if the impasse is not settled, the Commission is empowered to recommend or invoke fact-finding. Finally, in this connection it must be

observed that a Commission composed, as this one is, of two representatives of labor, two of employers, and three from the public, is more geared to mediation and arbitration than to adjudication. Where adjudication and affirmative remedy are involved, one looks for professional type boards. See e. g., 29 *U. S. C. A.* § 153 (a) ; cf. *Van Riper v. Traffic Tel. Workers Fed. of N. J.,* 2 *N. J.* 335 (1949).

Even if there were no other administrative remedy available, the absence of any express or clearly implied legislative authorization to the Commission to hear, decide and issue affirmative remedial orders in labor dispute cases arising out of improper discharge of an employee for joining or assisting a union would not leave the employee helpless.[1] If necessary, the employee may seek a remedy in the courts where, upon a showing of a discharge in violation of his constitutional and statutory rights to join and assist a union, an appropriate remedy wlil be provided for him. *Cooper v. Nutley Sun Printing Co., Inc.,* 36 *N. J.* 189 (1961).

There can be no doubt that, prior to the adoption of *L.* 1968, *c.* 303, the Legislature was aware of the view held by advocates of public employer-employee legislation that, if adopted, it should contain an express litany of unfair labor practices on the part of the employees and on the part of the employers, as well as an express authorization, to whatever board or agency is created to administer the law, to hear and decide controversies involving such practices and to issue remedial orders respecting them.

Unquestionably, the Legislature had knowledge that the Labor-Management Relations Act on the Federal scene contained an itemization of unfair labor practices by an employ-

---

[1] If such a grievance or difference is not settled voluntarily under subsection (c) of *N. J. S. A.* 34:13A–6 through the intercession of the Commission, conceivably the agency may then invoke fact-finding. A fact-finding of discriminatory discharge in violation of the Act and its attendant publicity may produce sufficient psychological pressure on the public employer to bring about reinstatement. However, PERC did not pursue this alternative in this case and we do not find it necessary to consider the propriety of such a procedure.

er and a separate itemization of such practices by a labor organization or its agents. 29 *U. S. C. A.* § 158(a) and (b). It is fair to assume also that the lawmakers knew that the National Labor Relations Board had been established with plenary hearing and adjudicatory powers respecting charges of unfair labor practices, as well as specific authority to issue cease and desist orders with respect to them and "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies" of the Act. 29 *U. S. C. A.* § 160(c).

The appendix attached to the Final Report to the Governor and the Legislature of the Public and School Employees' Grievance Procedure Study Commission of January 9, 1968 is of considerable significance in seeking the Legislature's intention in adopting the New Jersey Act. Appendix 7 recites that the statutes of California, Connecticut, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New York, Oregon, Pennsylvania, Rhode Island, Washington and Wisconsin were reviewed. Report p. 40.

The statutes of Connecticut *(Conn. Gen. Stat. Ann.* § 7–467, 470 and 471(4), (Supp. 1970)), Massachusetts *(Mass. Ann. Laws. ch.* 149 § 178F *et seq.* (Supp. 1969)), Michigan *(Mich. Stats. Ann.* § 17.455(1) *et seq.,* M. C. L. A. § 423. 201 *et seq.*), Rhode Island ( *R. I. Gen. Laws Ann.* §§ 28–9.4–1 to 19), Vermont *(Vt. Stat. Ann., tit.* 21 § 1701 *et seq.* (Supp. 1969)), Washington *(Wash. Revised Code Ann., c.* 41.56 (Supp. 1969)),[2] Wisconsin *(Wis. Stat. Ann.* § 111.80 *et seq.* (Supp. 1969)), all (except Michigan) define and list in separate sections the acts which shall constitute unfair labor practices on the part of the public employer and either the public employees or their bargaining representative. (Michigan lists only the acts of the employer which constitute unfair labor practice. § 17.455 (10), M. C. L. A. § 423.210.) All of them (except Massachusetts) authorize a

---

[2] Washington's inclusion in its statute of separate sections setting out employer-employee unfair labor practices occurred in 1969. 1st Ex Sess. 1969, ch. 215 (effective May 8, 1969).

board to hear such charges and issue cease and desist orders and (generally in the same or substantially similar language) to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of the Act.

The reference, in the report mentioned above, to the states with such comprehensive statutes justifies an inference that our Legislature's failure to follow them was deliberate. There are other indications of such a probability. At the time Chapter 303, *L.* 1968 was adopted Senate Bill 699 was also before the lawmakers. It set forth a schedule of unfair labor practices of public employers and employees and authorized a Public Employment Board to hear charges of commission of such practices and to issue specified affirmative remedial orders. That bill was never released from Committee. It may be that one portion of the Study Commission's Report to the Legislature was a particularly influential factor. The Report said:

"The Commission believes that the parties should have the fullest opportunity to make a voluntary system work, and there is ample evidence from other jurisdictions that compulsion should be a last resort rather than a first. Similarly, the Commission has concluded that experience elsewhere indicates the extreme difficulty of defining and applying effective sanctions, and attempts to specify sanctions should be deferred until their need and feasibility can be ascertained." Report, p. 13.

One of the statutes the Study Commission reviewed and so advised the Legislature was that of our sister State, New York, which was approved in April 1967 and became effective the following September. Public Employees' Fair Employment Act, N. Y. Civil Service Law § 200 *et seq.* (McKinney's Consol. Laws. c. 7; *L.* 1967, *c.* 392). That Act contained neither an explicit listing of unfair labor practices by public management or employee organizations, nor a special procedure to litigate charges of this nature, nor a specific series of remedies for such practices. The considerable parallelism between the New York statute and our own which was passed

a year later is persuasive that the former exerted some influence in the formulation of the New Jersey Act.

The New York statute came before the courts of that state for interpretation and application in a case strikingly similar to the one now before us. In *Helsby v. Board of Education of Cent. Sch. District No. 2*, 59 *Misc.* 2d 943, 301 *N. Y. S.* 2d 383 (Sup. Ct. 1969), a teacher was denied tenure and discharged because of her organizational activities on behalf of a union. After a hearing, the New York Public Employment Relations Board, acting under the 1967 statute, found that the discharge was an act of reprisal because of the teacher's "activities on behalf of an employee organization." Thereupon it ordered the Board of Education to reinstate her and to compensate her for wages lost as the result of the discharge.

The Public Employment Relations Board sought a judgment enforcing its orders for reinstatement and back pay. The Supreme Court refused the relief holding that the Board was without jurisdiction to hear and decide such an unfair labor practice case or to order the specified affirmative relief.

New York's PERB recognized the right of a board of education under the Education Law to deny tenure to a probationary teacher but contended that such right must bow to the provisions of the Public Employees' Fair Employment Act (Taylor Law) to the extent that such a denial of tenure must not be in violation of a teacher's right to organize, join and participate in employee organizations. PERB called attention to the section thereof which granted the power to it to make, amend and rescind rules and regulations, and to exercise such other powers "as may be appropriate to effectuate the purpose and provisions of this article." Based thereon, PERB argued that its authority to adopt rules for the hearing, determination and issuance of orders relative to charges that a public employer has engaged in an act of reprisal against a public employee was implicit in the Taylor Law. Moreover, it asserted that the exercise of such authority was necessary and proper to effectuate the purposes of the statute

and to protect the rights of public employees to join and participate in employee organizations as guaranteed by the statute.

In vacating the order, the court pointed out that the statute did not contain any provisions relating to acts of reprisal by a public employer, or other unfair labor practices, nor was PERB expressly empowered to prevent labor practices.

The decision was handed down on June 11, 1969. While the case was pending, the New York Legislature amended the Taylor Law (effective September 1, 1969) by adding a new section specifying improper employer practices and improper employee organization practices. A paragraph was also added to another section giving PERB the authority to establish procedures for the prevention of improper employer and employee organization practices as thus defined. 301 *N. Y. S.* 2d at 387–388.

Subsequent to the decision in *Helsby* and the amendment of the Taylor Law, Assembly Bill No. 897 was introduced in New Jersey and has been referred to the Committee on State Government. The proposed statute supplements *L.* 1968, *c.* 303, by adding two new sections, one specifying improper employer labor practices and the other, improper employee organization practices. However, the supplement does not contain an authorization to PERC to hear such charges and to make affirmative remedial orders with respect thereto.

■■ As we said in *Lullo v. International Ass'n of Fire Fighters, supra,* 55 *N. J.* 409, Chapter 303, *L.* 1968 is novel legislation in New Jersey. For the first time the Legislature entered broadly into the field of labor relations in the public sector. Whether PERC should be invested with authority to hear and decide unfair labor practice charges and to issue various types of affirmative remedial orders respecting them in an important policy question. In our judgment, a policy question of that significance lies in the legislative domain and should be resolved there. A court should not find such authority in an agency unless the statute under consideration confers it expressly or by unavoidable implication. In this

case, obviously the statute does not expressly confer the power sought to be exercised by PERC. And, in our judgment, the statutory language does not justify a judicial determination that power of such magnitude resides there by implication.

All that we have said above in reviewing the history of the Act and the milieu in which it was adopted makes it plain that if the Legislature desired or intended to grant authority of the scope claimed, it could have done so without difficulty. Ample statutory precedents were available on the national scene as well as in the states referred to above. As a consequence the best we can say about the statute is that our analysis has left us with grave doubt as to whether the Legislature granted or intended to grant the authority in issue in this case. In situations where such an important public policy matter is involved the proper course for the judicial branch of the government to follow is to deny the power and to assume that if the legislative branch desires PERC to have the authority, it will bestow it in unmistakable terms.[3]

Under the circumstances, the Commission order entered in favor of Mrs. Cooper is set aside, and the matter is remanded for dismissal of her petition.

Before leaving the matter finally, a word should be said about Mrs. Cooper's situation when this opinion is filed. On

---

[3]In this connection a comment in 68 *Mich L. Rev.* 260, 288 (1969) entitled "Collective Bargaining for Public Employees and the Prevention of Strikes in the Public Sector" says:

"Another possible device which may prove useful in promoting effective collective bargaining for public employees while avoiding strikes is the unfair labor practice proceeding. The remedy provided by such a proceeding is potentially important, particularly in a comprehensive collective bargaining program. Like arbitration, however, it is presently available in only a few states; * * *.

Typically, unfair labor practice procedures are modeled after those of the NLRA, and permit an aggrieved party to bring actions before a quasi-judicial body, charging the violation of specific statutory prohibitions. That procedure is most effective in performing such functions as enforcing recognition and enjoining antiunion discrimination. * * *"

the record now before us, her constitutional and statutory right to join or assist a labor organization appears to have been violated. It was only when her prompt request to the Civil Service Commission for a hearing as to the propriety of the denial of permanent employee status and her discharge was denied that she turned to PERC. The fact that her right could not be vindicated there ought not in justice leave her remediless. In an area of the law which is just developing, it should not be said that her appeal to PERC was frivolous. Moreover, it appears from the brief of the Civil Service Commission as *amicus curiae* that further consideration has been given to the relationship between the Commission and PERC with respect to the violation of unionization rights of employees in the public sector and that a broader approach to the Commission's jurisdiction is now being taken.

██ In the absence of some legislative restriction, administrative agencies have the inherent power to reopen or to modify and to rehear orders that have been entered. Of course, the power must be exercised reasonably and application seeking its exercise must be made with reasonable diligence. In cases like the present one involving unique developments in the administration of a new law, an agency ought to be allowed and willing to reconsider the equity of an earlier ruling based upon inadequate precedent. See *Handlon v. Town of Belleville,* 4 *N. J.* 99 (1950) ; *Southwestern Bell Telephone Co. v. State,* 181 *Okl.* 246, 71 *P. 2d* 747 (1937), *appeal dismissed* 303 *U. S.* 206, 58 *S. Ct.* 528, 82 *L. Ed.* 751 (1938) ; 2 *Davis, Administrative Law,* § 18.09, p. 605–07 (1958) ; 2. *Am. Jur.* 2d, *Administrative Law,* § 522, p. 330–32 (1962).

Under the unusual circumstances in this case, after the entry of our judgment, Mrs. Cooper may, if she desires, apply forthwith to the Civil Service Commission to reopen its summary denial of a hearing and to hear her appeal on the merits.

No costs.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.