**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2053-19

THE ESTATE OF WILLIAM J.
HAMILTON, JR.,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
PUBLIC EMPLOYEES'
RETIREMENT SYSTEM,

     Respondent-Respondent.

_____

Argued May 10, 2021 – Decided June 14, 2021

Before Judges Sabatino and Gooden Brown.

On appeal from the Board of Trustees of the Public Employees' Retirement System, Department of the Treasury, PERS No. x-xxxx764.

Jay Holub argued the cause for appellant (Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, PC, attorneys; Jay Holub, on the briefs).

Jeffrey D. Padgett, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant

Attorney General, of counsel; Jeffrey D. Padgett, on the brief).

PER CURIAM

The Estate of William J. Hamilton, Jr. appeals from the December 13, 2019 final agency decision of the Board of Trustees (Board) of the Public Employees' Retirement System (PERS). The Board adopted the Administrative Law Judge's (ALJ) initial decision concluding that Hamilton was an employee of the City of New Brunswick from 1986 through his purported retirement and separation from employment effective August 1, 2007, continued working for New Brunswick without observing the requisite thirty-day break in service prior to returning to employment required under N.J.A.C. 17:2-6.2, and earned more than $15,000 annually during his continued employment with New Brunswick contrary to N.J.S.A. 43:15A-57.2(b).[1] Because the Board concluded that Hamilton did not effectuate a bona fide retirement, it demanded the reimbursement of all retirement benefits received by Hamilton as well as the payment of the appropriate pension contributions for the period after August 1, 2007, resulting from his continued employment with New Brunswick,

---

[1] Hamilton died on October 10, 2019, after the initial decision was rendered by the ALJ but prior to the Board issuing its final decision. However, the ensuing notice of appeal used the same caption as the underlying matter. We subsequently granted the motion to amend the caption to substitute the Estate.

amounting to $500,463.27.[2]  We are persuaded that in the compelling circumstances of this case, the Board's action constitutes an arbitrary and capricious agency decision.  We therefore reverse.

I.

We glean these facts from the record.  Hamilton was appointed the municipal attorney for the City of New Brunswick (City) by ordinance in 1986, and was reappointed annually through August 1, 2007, when he retired.[3]  In his capacity as municipal attorney, Hamilton reported directly to the Mayor, served as the Director of the Law Department where he was the point person for any legal matter pertaining to the City, and supervised two assistant city attorneys.  Hamilton maintained a private law practice while serving as municipal attorney

---

[2]  At our request, we received a post-argument submission from the Board clarifying the exact repayment amount sought.  Without explanation, the submission also "rescinded" a May 3, 2021 letter from a Supervising Pension Benefits Specialist in the Division of Pensions and Benefits which, according to the Board, "erroneously stated that [the Board was] not seeking recoupment from Hamilton's estate."  The May 3, 2021 letter, which was attached to the post-argument submission, stated that the agency's Director had made the decision to not seek recoupment from the estate.  Evidently, the Board disagreed.

[3]  Hamilton had been in public service since he was elected to the New Jersey Assembly in 1971 and served three terms, after which he was elected to the New Jersey Senate for one term.  In 1981, he ran for Governor but lost in the primary. Hamilton also held other municipal attorney positions for different municipalities since 1976.

A-2053-19

and performed City work at a designated area in city hall shared with law department staff as well as in his private law office located a half block from city hall.

Hamilton's position as municipal attorney was part-time and his employment arrangement with the City had two components of compensation, salary and billable hours. Hamilton received a salary for the first five hours worked on a specific task and billed the City at an hourly rate pursuant to a professional service agreement (PSA) for any work performed over five hours. Hamilton received a W-2 tax form for his salary and Internal Revenue Service (IRS) form 1099s for any additional work billed.[4] Hamilton received health benefits from the City but no vacation or sick time.

In 2007, Hamilton notified the Mayor and City Council that he intended to retire, effective July 31, 2007. Hamilton told the Mayor he would take his pension and come back and continue to work for the City at a significantly reduced salary. Under this arrangement, Hamilton would receive a salary of under $15,000 and bill the City at an hourly rate for work performed in excess

---

[4] "[A] professional may provide some services to a governmental entity which are compensated by 'salary, for services as an employee' within the intent of N.J.S.A. 43:15A-6(r) and other services compensated on a fee basis for which the professional is deemed to be an 'independent contractor.'" Mastro v. Bd. of Trs., Pub. Employees' Ret. Sys., 266 N.J. Super. 445, 453 (App. Div. 1993).

 A-2053-19

of the salaried hours. In June 2007, Hamilton notified the Division of Pensions and Benefits (Division) of his retirement plan and outlined his hybrid position. Douglas Petix, the City's Director of Finance and Chief Financial Officer (CFO), submitted to the Division a Certificate of Service and Final Salary for Hamilton dated July 31, 2007.[5] Hamilton's retirement was approved by the Board on October 17, 2007, and he began receiving pension payments shortly thereafter.

After his retirement in August 2007, by agreement, Hamilton's annual salary was reduced from $82,298 to approximately $14,992. Although he continued to bill the City for hourly work performed pursuant to a PSA, Hamilton's 1099 income was also less than each year prior to his retirement.

Presumably in response to Hamilton's June 2007 notification to the Division of his post-retirement employment, Hamilton received a letter dated March 3, 2008, from Michael R. Czyzyk, a Division Supervisor of External Audit, stating that the Division had "investigated [Hamilton's] post-retirement employment with the City . . . in the position of City Attorney," and determined that it was "not in violation of N.J.S.A. 43:15A-57.2." The letter specified that Hamilton was "in compliance with the laws that govern [PERS]."

---

[5] Hamilton's 1099 earnings were not included in the certification and were explicitly excluded from pension compensation calculations for his entire career.

The letter explained that:

> The Division's determination is based upon a decision handed down [o]n October 16, 2002 by New Jersey Attorney General David Samson. The finding in pertinent part stated: "As long as the appointee knowingly and voluntarily waives his right to receive the minimum salary, such action is permissible. Moreover . . . the policy underlying N.J.SA. 43:15A-57.2 is not violated by the appointee's decision to take a lower salary. This statute is designed to permit public employment by retirees provided they do not earn more than $15,000 per year." As such, a PERS retiree is permitted to accept a salary of $15,000 or less while continuing to receive a PERS pension allowance and remain within the provisions of N.J.S.A 43:15A-57.2.
>
> The Division also considered the relevance of two new laws, namely, Chapter 92, P.L. 2007 and Chapter 103, P.L. 2007 that have an effective date of July 1, 2007. The new laws set forth the criteria for enrollment in the Defined Contribution Retirement Program (DCRP). A professional who provides services under a [PSA] with a local unit is not eligible for PERS or DCRP.

On February 8, 2016, almost nine years after formally approving Hamilton's retirement, the Board notified Hamilton that it was denying "all PERS pension credit" for his service to the City "from April 1, 1986 through July 31, 2007." The Board noted that "[t]he review of Hamilton's membership began as a result of the enactment of Chapter 92, P.L. 2007." The Board concluded that Hamilton was "not eligible for PERS" as he was found "to

6

be . . . an independent contractor under N.J.S.A. 43:15A-7(b), and not . . . an employee, as required for PERS membership."

Additionally, the Board noted that even if Hamilton was "determined to be an employee . . . from 1986 through 2007, [his] retirement in 2007 would be non-bona-fide." The Board explained that "in order to have a valid retirement[, one] must have at least a [thirty-]day break in service from [one's] retirement date or Board approval, whichever [was] later." However, by November 16, 2007, when "the [thirty]-day minimum break in service would have expired" based on the October 17, 2007 Board approval of Hamilton's retirement, Hamilton's "billing statements" revealed that he "had returned to work at New Brunswick" during "the period August 1 . . . through November 16, 2007" and earned "more than $30,000."

The Board expounded that if Hamilton's service as the City's municipal attorney was deemed "pensionable employment" and if his retirement was "then determined to be invalid due to [his] failure to effect the required break in service," then Hamilton "would be required to return all pension payments that were paid." In addition, Hamilton "would have to make PERS contributions on all income attributable to pensionable employment with [the City] up to the present."

7

Hamilton requested an administrative hearing, and the matter was transferred to the Office of Administrative Law as a contested case. See N.J.S.A. 52:14B-9 to -10. A two-day hearing was conducted on February 8 and May 4, 2017, during which the ALJ heard testimony from Hamilton and CFO Petix, as well as Kristin Conover, a representative from the Division's Pension Fraud and Abuse Unit.[6]

Conover testified about the Division's review of Hamilton's PERS membership while serving as the City's municipal attorney and emphasized that there were no allegations that Hamilton had committed pension fraud or abuse. Petix testified about his role as the PERS certifying officer for the City and his submission to the Division of the IRS twenty-factor checklist questionnaire.[7] According to Petix, he completed the questionnaire at the Division's request with Hamilton's assistance to determine whether Hamilton was, in fact, a City

---

[6] Transcripts of the hearing were neither provided in the record nor identified in the statement of items comprising the record on appeal. See R. 2:5-4(b). We recount the witnesses' testimony from the ALJ's factual findings.

[7] See Francois v. Bd. of Trs., 415 N.J. Super. 335, 350-51 (App. Div. 2010) (approving pension board's use of twenty-factor test "which was originally set forth by the [IRS] in Rev. Rul. 87-41, 1987-1 C.B. 296, 298-99, to determine whether a . . . person was an employee whose service and salary was creditable in PERS").

employee eligible for PERS membership from 1986 until his retirement on August 1, 2007.

During his testimony, Hamilton acknowledged knowing that he had to have a break in service of thirty days. In fact, he sent a memorandum to the City Council dated July 31, 2007, notifying it that he would not be at the August 2007 meeting that he would ordinarily attend because he had to have a break in service for thirty days. However, Hamilton admitted that he did not adhere to the thirty-day separation requirement. He admitted working on a matter for the City when called upon to do so and billing accordingly. He stated candidly "[he] made a mistake."

On September 10, 2019, the ALJ issued his initial decision in which he found that the facts were essentially undisputed. After analyzing the twenty-factor IRS questionnaire, the ALJ rejected the Board's contention that Hamilton was ineligible for PERS membership for the duration of his career. Instead, the ALJ determined that Hamilton "was an employee of the City" and "eligible to be a member of PERS" from the time of his initial appointment in 1986.

A-2053-19

However, the ALJ noted that under N.J.A.C. 17:2-6.2, "Hamilton was required to separate from work for a thirty[-]day period" after his retirement.[8] The ALJ explained:

> It is undisputed that Hamilton continued to work for the City . . . during the thirty[-]day period he was to separate himself from employment. Hamilton candidly admitted the same during his testimony. Invoices he submitted show he billed the City during this period. It is not important if one calculates the thirty[-]day period from August 1, 2007 (the date he retired) or October 17, 2007 (the date the Board approved the retirement), as bills submitted encompass this time frame.

Further, applying N.J.S.A. 43:15A-57.2(b), which allows a retiree to become re-employed in a PERS-covered position while receiving a retirement allowance as long as "the aggregate compensation does not exceed $15,000 per year," the ALJ stated:

> While it is true [Hamilton's] salary was never more than $15,000 after he retired, it is not disputed that he earned substantially more by submitted invoices for additional services. Hamilton's reliance on the letter dated March 3, 2008 from . . . Czyzyk . . . is unfounded. The letter does not address his additional income from the City. Nor does it address the fact that he failed to make a separation of service for the required thirty days.

---

[8] See also N.J.A.C. 17:2-2.3(a)(7) (considering PERS members to be "retired member[s]" if they have "not received compensation from employment covered by the PERS for at least [thirty] consecutive calendar days").

Thus, the ALJ concluded that

> Hamilton did not effectuate a bona fide retirement on August 1, 2007, as he continued to work for the City . . . as the municipal attorney during the period between the date of his purported retirement of August 1, 2007 through November 16, 2007, the date the thirty[-]day separation would have ended after the Board's approval of his retirement; and, Hamilton should have remained in PERS after 2007 rather than receive a pension[] for doing the same work he did before his purported retirement.

Accordingly, the ALJ ordered that Hamilton "should reimburse PERS for the retirement benefits he received and . . . make appropriate pension contributions for the period after August 1, 2007[,] through his continued employment with [the City.]"

Hamilton filed exceptions to the initial decision, invoking equitable estoppel. After reviewing Hamilton's exceptions, the Board abandoned its attempt to disqualify Hamilton from PERS membership for his career, "adopted the ALJ's [i]nitial [d]ecision" invalidating Hamilton's retirement, and sought "reimburse[ment] for all retirement benefits . . . received beginning August 1, 2007 through his separation from employment in 2019."[9]

---

[9]  Hamilton left employment in May 2019, five months prior to his death.

In this ensuing appeal, Hamilton raises the following points for our consideration:

POINT I:

A DE NOVO STANDARD OF REVIEW IS APPLIED BY THE APPELLATE DIVISION TO AN AGENCY'S DECISION WHICH WILL BE REVERSED WHEN ITS DECISION IS ARBITRARY, CAPRICIOUS, OR UNREASONABLE OR VIOLATES EXPRESSED OR IMPLIED LEGISLATIVE POLICIES.

POINT II:

THE AUTOMATIC APPROVAL BY PERS OF THE OAL'S INITIAL DECISION THAT FAILED TO CONSIDER THE EQUITABLE ESTOPPEL ARGUMENT PRESENTED BY [HAMILTON] IN HIS POST HEARING BRIEF AND EXCEPTIONS TO THE INITIAL DECISION WAS ARBITR[A]RY, CAPRICIOUS AND UNREASONABLE AND VIOLATED THE EXPRESSED AND IMPLIED LEGISLATIVE POLICIES SET FORTH IN THE AGENCY'S ENABLING LEGISLATION.

POINT III:

[HAMILTON'S] POST-RETIREMENT WORK SHOULD NOT DISQUALIFY HIM FROM PERS.

POINT IV:

THE DETERMINATION BY PERS TO INCLUDE [HAMILTON'S] POST-RETIREMENT 1099 INCOME IN HIS SALARY TO DISQUALIFY HIM FROM RECEIVING HIS PENSION WAS ARBITRARY, CAPRICIOUS AND

12

UNREASONABLE AND VIOLATED THE EXPRESSED AND IMPLIED LEGISLATIVE POLICIES SET FORTH IN THE AGENCY'S ENABLING LEGISLATION.

POINT V:

PERS FAILED TO CONSIDER HAMILTON'S EXCEPTION THAT EQUITABLE CONSIDERATION SHOULD BE GIVEN IN DETERMINING A FAIR RE-ENROLLMENT DATE IF IT WERE NECESSARY.

## II.

We begin our analysis by acknowledging the longstanding and well-accepted principles of judicial review of administrative agency actions. "The scope of that review is limited." In re Herrmann, 192 N.J. 19, 27 (2007). As the Court observed in Herrmann, "[a]n administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Id. at 27-28. Thus, on appeal, our role is limited to the evaluation of three factors:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly

13

erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

> [Id. at 28 (quoting Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995)).]

When the agency's decision satisfies those criteria, we are obliged to afford substantial deference to the agency's expertise and superior knowledge of a particular field, even if we would have reached a different result from that reached by the agency. Ibid.; In re Taylor, 158 N.J. 644, 657 (1999).

Against this backdrop, we acknowledge that appellate courts have repeatedly recognized that as a matter of sound public policy, statutes creating pensions should be liberally construed in favor of those they are intended to benefit. As long ago as 1969, our Supreme Court held that:

> Pensions for public employees serve a public purpose. A primary objective in establishing them is to induce able persons to enter and remain in public employment, and to render faithful and efficient service while so employed. They are in the nature of compensation for services previously rendered and act as an inducement to continued and faithful service. Being remedial in character, statutes creating pensions should be liberally construed and administered in favor of the persons intended to be benefited thereby.
>
> [Geller v. Dep't of the Treasury, 53 N.J. 591, 597-98 (1969).]

The Court reiterated that principle in <u>Klumb v. Board of Education</u>, 199 N.J. 14, 34 (2009), as did we in <u>Bumbaco v. Board of Trustees of Public Employees' Retirement System</u>, 325 N.J. Super. 90, 94 (App. Div. 1999), <u>Francois v. Board of Trustees</u>, 415 N.J. Super. 335, 349 (App. Div. 2010), and <u>Bueno v. Board of Trustees</u>, 422 N.J. Super. 227, 241-42 (App. Div. 2011). "Thus, '[f]orfeiture of earned pension rights . . . constitutes a drastic penalty which the New Jersey Supreme Court has become increasingly loath to permit . . . unless that penalty has been clearly mandated by the Legislature.'" <u>Bueno</u>, 422 N.J. Super. at 242 (alteration in original) (quoting <u>Fiola v. State, Dep't of Treasury, Div. of Pensions</u>, 193 N.J. Super. 340, 347-48 (App. Div. 1984)).

To that end, "[p]rinciples of equitable estoppel may . . . be applied to the Board for its actions." <u>Sellers v. Bd. of Trs. of the Police & Firemen's Ret. Sys.</u>, 399 N.J. Super. 51, 59 (App. Div. 2008). "In numerous circumstances, the courts have said that the government must 'turn square corners' in its dealings with others, and 'comport itself with compunction and integrity.'" <u>Sellers</u>, 399 N.J. Super. at 59 (quoting <u>F.M.C. Stores Co. v. Borough of Morris Plains</u>, 100 N.J. 418, 426-27 (1985)). Indeed, "even with respect to public entities, equitable considerations are relevant in evaluating the propriety of conduct taken after

substantial reliance by those whose interests are affected by subsequent actions." Ibid. (quoting Skulski v. Nolan, 68 N.J. 179, 198 (1975)).

Notably, our Supreme Court has held that considerations of equity and fairness must temper the application of deadlines in the administration of the pension fund. In Ruvoldt v. Nolan, 63 N.J. 171, 173-74 (1973), the Court considered whether eight years after an assistant prosecutor retired on a disability pension, the court-designated Receiver for the Hudson County Employees Pension Commission was entitled to vacate and set aside the disability pension granted by that body to the retiree, Harold J. Ruvoldt. Despite evidence in the record suggesting that the Receiver's decision was correct and that Ruvoldt was medically able to continue his work as an assistant prosecutor, the Court declined to reach the merits of the controversy, instead concluding that principles of equity and fairness rendered it "clearly unjust" to apply "a substantive rule of disentitlement of pension against Ruvoldt" eight years after the fact. Id. at 183.

The Court emphasized that the retiree's reliance on the pension board decision, and the absence of "fraud or illegality" should play a role in determining whether the refund of pension benefits should be required, and that any review of pension eligibility "must be made with reasonable diligence."

 A-2053-19

Ibid. (quoting Burlington Cnty. evergreen Park Mental Hosp. v. Cooper, 56 N.J. 579, 600 (1970)). The Court observed that even if the decision to approve the pension had been clearly improper, "the question of overall fairness and justice in the attendant circumstances cannot be overlooked" even in the face of "diversion of public funds for statutorily unwarranted pensions." Id. at 184-85.

The Court held:

> Eight years after the original administrative action the course of events cannot be rerun. Had the pension been denied Ruvoldt at the time as legally unwarranted, he could have tried to obtain employment in non-trial legal work from the county, and, if successful, achieved a right to pension after seven additional years of service . . . . Or he might possibly have been able to muster medical proof that he was unfit to do full-time legal work at all, whether trial or non-trial. We are not assuming he would necessarily have been successful in either of these endeavors. The point is that he lost the chance when the pension was allowed. . . . It would be essentially unjust to undo the pension grant so many years later after such circumstances of reliance and irremediable change of position as here manifested.
>
> [Id. at 185.]

Here, having thoroughly reviewed the record presented, we are satisfied that the agency's December 13, 2019 final decision is arbitrary and inequitable and cannot be sustained. It is undisputed that Hamilton never sought to abuse or manipulate the pension system. Indeed, he sought a determination by the

Division regarding the validity of his hybrid post-retirement employment as early as 2007 and was assured in 2008 by Czyzyk, a Division Supervisor of External Audit, that Hamilton was "in compliance with the laws that govern [PERS]." Czyzyk's determination was reached following an investigation of Hamilton's post-retirement employment. Thus, we consider the ALJ's and, in turn, the Board's rejection of Hamilton's reliance on Czyzyk's letter as a cramped view of its import and contents. See Mastro, 266 N.J. Super. at 455 (holding that the appellant's "justifiable reliance upon the advice of the Division of Pensions in pursuing his retirement plans" constitutes "equitable considerations which militate against" the Board's challenge notwithstanding the fact that the appellant "retired from his public positions before receiving th[e] letter").

We are convinced that had Hamilton known the ramifications the Board now seeks to impose upon him, he would have pursued an alternate course. See Vliet v. Bd. of Trs., 156 N.J. Super. 83, 90 (App. Div. 1978) (holding that although the retiree was not a temporary employee within the meaning of the applicable pension law, and was consequently not entitled to the pension payments he had received during a three-year period, requiring the retiree to make a "total reimbursement would be inequitable" as it was "unlikely" that the retiree "would have continued in part-time employment at $2000 a year if he

had known that he would have to give up a pension of approximately $5300 a year"); see also Mastro, 266 N.J. Super. at 455 (accepting the appellant's testimony that "he could have been reappointed" by his former municipal employers "on a non-salaried basis" if "the Board had told him [prior to his retirement] that his performance of legal services for [the municipalities] would result in the invalidation of his pension").

To be clear, we are neither validating the compensation terms that Hamilton and the City agreed to in 2007 nor ignoring the strong public policies and fiscal concerns that underlie the pension reform statutes. Instead, we rest our decision on equitable grounds that are manifestly compelling in this case, including the oft-stated principle that government "must turn square corners" in its interactions with the public and the people directly affected by its decisions. Sellers, 399 N.J. Super. at 59.

For decades, Hamilton served honorably in public service, and his honest mistake in handling a few legal matters during the thirty-day interval should not result in the catastrophic result that the Board demands of him. We also conclude that the Board's nine-year delay in notifying Hamilton that, contrary to the agency's previous determination, his retirement was not bona fide exceeded the standards of reasonableness we expect of a public agency. Given

19

the absence of bad faith on the part of Hamilton as well as Hamilton's legitimate reliance on Czyzyk's assurance, the violation that occurred should not deprive a career public servant and now his estate of his earned pension benefits. The Board's decision to the contrary was arbitrary and capricious and the interests of justice require it to be set aside in this exceptional situation.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION